# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

SHANNON WAYNE GARRISON
and CONNIE SUE GARRISON,　　)
　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　)
　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
STURM, RUGER & COMPANY,　　)
INC.,　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
　　　　Defendant.

Civil Action Number
**5:16-cv-01559-AKK**

## <u>MEMORANDUM OPINION</u>

This products liability action arises from injuries Shannon Wayne Garrison sustained from the accidental discharge of his Ruger "Blackhawk" revolver. Following his accident, Garrison filed suit against Sturm, Ruger & Company (Ruger), the revolver's manufacturer, alleging negligence (Count I), breach of the Alabama Extended Manufacturers' Liability Doctrine (AEMLD) (Count II), breach of the implied warranty of merchantability (Count III), and strict liability (Count IV).[1]  Ruger has now moved for summary judgment, doc. 36, arguing primarily that its "old-model" single-action revolver was not a defective product, and that its alleged failure to adequately warn Garrison was not the proximate cause of his

---

[1] Garrison's wife, Connie Sue Garrison, also brings a loss of consortium claim (Count V). The court need not address this derivative claim separately and treats Shannon Garrison as the sole plaintiff in this action. *See Ga. Power Co. v. Partin*, 727 So. 2d 2, 6 (Ala. 1998).

accident. That motion is now fully briefed, docs. 37; 40; and 42, and ripe for review. After careful consideration of the parties' excellent briefs, Alabama law, and the entirety of the record, the court finds that Ruger's motion is due to be granted.

## I.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "a party opposing a properly supported motion for summary judgment . . . must set forth specific facts showing that there is a genuine issue." *Id.* at 256.  However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.  Indeed, it is explicitly not the role of the court to "weigh conflicting evidence or to make credibility determinations." *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); *see also Anderson*, 477 U.S. at 255 (explaining "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

"[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Nor will "a . . . 'scintilla of evidence in support of the nonmoving party . . . suffice.'" *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)).  In short, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## II.  FACTS

### A. The Accident of September 21, 2014

On September 21, 2014, Garrison was checking several game cameras he had placed at the Capsy Hunting Club in Winston County, Alabama while riding his ATV through the property.  Doc. 41-6 at 3.  Garrison was carrying his fully loaded Ruger "Blackhawk" revolver in a holster on his right hip with the firearm's hammer in the full down position, the hammer position he believed was designed to allow for the safe carrying of the weapon.  Docs. 41-1 at 9, 15; 31-4 at 17.  While driving over an unpaved road, the revolver fell from the holster and discharged upon striking the ground.  *Id.* at 11, 15–16.  The bullet struck

Garrison's right ankle and traveled upward through his body, seriously injuring him and causing him to fall from the ATV. *Id.* at 7, 16–18; Doc. 41-6 at 4. Despite his injuries, Garrison managed to use the ATV to return to his truck and then drove to a nearby home for assistance in guiding first responders to his remote location. Doc. 41-1 at 7–8. Garrison was subsequently airlifted to an area hospital where he underwent extensive medical treatment. *Id.* at 8. To this day, Garrison continues to receive medical treatment for his injuries. *Id.* at 40-41.

### B. The Mechanical Operation of the Revolver and Alternative Designs

The Ruger Blackhawk at issue here is part of a line of Ruger "old-model" single-action revolvers. Doc. 37-2 at 3–4. Ruger intended this product line to replicate the look and feel of an iconic firearm, the Colt Model 1873 Single-Action Army Revolver. Docs. 41-3 at 3; 37-4 at 34–35; 37-8 at 50. While Ruger largely retained the aesthetics and basic mechanical functioning of this classic firearm, it used modern materials in constructing the revolver and altered the dimensions and types of some of the gun's mechanical components. Docs. 41-3 at 3; 37-4 at 34; 37-8 at 50. Ruger manufactured its "old-model" single-action revolvers from 1953 until 1973 selling nearly 1.3 million units, including the revolver at issue in this case, which was originally purchased in 1969. Docs. 37-2 at 3–4; 37-8 at 50. The Ruger "old-model" single-action revolver had several distinctive characteristics including its single-action firing mechanism, which requires the user to manually

pull the hammer back into firing position before discharging the weapon. Docs. 37-4 at 35–36, 42, 51. In contrast, double-action revolvers do not require the user to manually "cock" the hammer before firing. Doc. 37-4 at 36, 42; 37-8 at 20. The Ruger "old-model" single-action revolver also incorporated a loading gate, a loading mechanism in which the cylinder remains attached to the frame of the gun and is rotated to individually load cartridges. Doc. 37-4 at 33–34; 37-8 at 17, 23. Other styles of revolver use different loading methods. For example, in a "top-break" revolver, the gun's frame is hinged to enable the barrel to be pushed down thereby opening the cylinder and allowing the user to rapidly load the weapon. Docs. 37-4 at 36; 37-8 at 23.

The Ruger "old-model," like its historical predecessor, has an external hammer with four possible resting positions: (1) full-down; (2) safety-notch; (3) loading notch; and (4) fully cocked. Doc. 37-3 at 13. In the full-down position, the hammer rests directly on the firing pin, the mechanism in the revolver which actually strikes the primer on the rear of the bullet causing the gun to discharge. Doc. 37-3 at 13; 37-8 at 29. There is no dispute that, in this configuration, a blow to the back of the hammer can cause the gun to fire accidentally, even if the trigger is never pulled. Doc. 37-3 at 13; 37-4 at 26. Similarly, there is no dispute that placing the hammer in the "safety" position does not fully alleviate the risk of

accidental discharge in the event that a sufficiently powerful blow to the hammer is sustained. Docs. 37-3 at 13; 37-4 at 17–18.

Ruger sold each of its "old-model" single-action revolvers with an instruction manual. Doc. 37-2 at 3. The manual outlined the various hammer positions and explained that "when the hammer is resting in the safety-notch, the gun may be safely carried loaded under all normal conditions." *Id.* at 10. The manual also provided bolded precautions for the use of "the older types of single action revolvers" namely that "[t]he gun should never be carried with the hammer resting on the firing pin and a loaded cartridge in the chamber that is aligned with the barrel" because of the danger of accidental discharge. *Id.* The parties agree that Garrison did not receive an instruction manual when he acquired the revolver from a second-hand purchaser, and that Garrison subsequently made no effort to either acquire a manual or to learn about the firearm's safety features and operating characteristics. Docs. 40 at 11; 41-1 at 33–34.

The parties also agree that several "passive" safeties capable of alleviating the risk of accidental discharge in the event a fully-loaded firearm was dropped were in use prior to 1970. Doc. 40 at 14–15. One suggested alternative, a "transfer bar" safety, primarily entailed the insertion of a steel bar between the hammer and the firing pin. Docs. 37-8 at 51-52; 41-3 at 4. When the trigger is pulled, the bar raises for the hammer to strike and then transfers the energy of the

blow to the firing pin.  Doc. 41-3 at 4.  Without the bar in place, the hammer is unable to strike the pin to discharge the weapon.  *Id.*  The other alternative, a rebounding hammer and hammer block safety, uses a spring to physically force the hammer away from the frame and then seals the hammer in position using a block or a plate.  *Id.*  The block only disengages when the trigger is pulled, again effectively preventing the hammer from striking the firing pin in other circumstances.  *Id.* at 4–5.  While these "passive" safety features would have prevented Garrison's injuries, no evidence has been presented to indicate that they were actually available for use in fixed cylinder, single-action revolvers sharing the characteristics of a Ruger "old-model" revolver in 1969.  *See* Docs. 37-4 at 38, 41–42; 37-8 at 52; 40 at 9 (arguing that a "rebounding hammer and hammer block design was available for *implementation* into the subject revolver") (emphasis added).  It was not until 1973 that Ruger developed and patented a transfer bar safety for use in a single-action revolver.  Doc. 37-8 at 51–52.

## III.  DISCUSSION

The complaint pleads four substantive counts related to the revolver. Garrison has conceded that one of these counts—strict liability (Count IV), is due to be dismissed.  *See* Doc. 40 at 19 n.7.  Therefore, the court will only address the first three counts.

### A. AEMLD and Negligence Design Claims–Count I and II

To establish liability under the AEMLD, Garrison must show that "(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff . . . , if (a) the seller is engaged in the business of selling such a product, and (b) it [reaches]the user . . . without substantial change in the condition in which it [was] sold." *Casrell v. Altec Indus., Inc.*, 335 So. 2d 128, 132–33 (Ala. 1976).  Despite the AEMLD's existence, however, traditional negligence claims, like the one asserted by Garrison in Count I, remain viable.  *See Tillman v. R.J. Reynolds Tobacco, Co.*, 871 So. 2d 28, 35 (Ala. 2003) (explaining that "the judicially created AEMLD . . . [does not] subsume[] the common-law tort actions of negligence and wantonness").  To prevail on a negligence theory against a manufacturer requires proof of the traditional elements of "(1) duty, (2) breach of duty, (3) proximate cause, and (4) injury." *Yamaha Motor Co. v. Thornton*, 579 So. 2d 619, 623 (Ala. 1991).

While these two causes of action remain conceptually distinct, "a plaintiff pursuing a products-liability claim against a manufacturer under either theory can succeed only if the plaintiff establishes that the product at issue is sufficiently unsafe so as to render it defective." *McMahon v. Yamaha Motor Corp., U.S.A.*, 95

So. 3d 769, 772 (Ala. 2012).[2] Under Alabama law, "[t]he term 'defective' means that the product fails to meet the reasonable safety expectations of an 'ordinary consumer,' that is, an objective 'ordinary consumer,' possessed of the ordinary knowledge common to the community." *Deere & Co. v. Grose*, 586 So. 2d 196, 198 (Ala. 1991); *see also Tillman*, 871 So. 2d at 32 (explaining that "[t]he important factor is whether it is safe or dangerous when the product is used as it was intended to be used . . [in other words] [t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community") (quotations omitted).[3]

Significantly, "'certain products whose inherent danger is patent and obvious, do not, *as a matter of law*, involve defects of a sort that a jury should

---

[2] As explained by the Alabama Supreme Court in the context of a tort suit based on the alleged defectiveness of a product, AEMLD claims overlap with common law torts in that the AEMLD retains "the tort concept of fault." *Casrell*, 335 So. 2d at 132. Fault, or negligence for AEMLD purposes is shown as a matter of law if the manufacturer "plac[es] a product on the market causing personal injury or property damage, when used to its intended purpose." *Id.* On the other hand, a traditional negligence claim based on a defective product requires an additional step beyond proof of deficiency: "that the manufacturer failed to exercise due care in the product's manufacture, design, or sale." *McMahon*, 95 So. 3d at 772. In either case, the burden of showing that the product is defective is identical. *Id.*

[3] Alabama courts appear to treat the terms "defective" and "unreasonably dangerous" synonymously: "a 'defect' is that which renders a product 'unreasonably dangerous,' i.e., not fit for its intended purpose." *Casrell*, 335 So. 2d at 133. However, the court's explanation that if a product is unreasonably dangerous "it is necessarily defective, and the consumer should not be required to prove defectiveness as a separate matter," *see id.* at 131, suggests that the concepts are distinct. The Court has since clarified that this language only means that "AEMLD plaintiffs [are relieved] of the burden of proving the specific negligent conduct that ultimately caused a defective condition in a manufacturer's product." *Taylor v. Gen. Motors Corp.*, 707 So. 2d 198, 202 (Ala. 1997). It is still necessary to "prove the existence of a defective condition." *Id.*

resolve.'" *Tillman*, 871 So. 2d at 32 (quoting *Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1507 (11th Cir. 1990)) (emphasis in original). In other words, simply because "'the use of [a] product[] involves some risk'" does not establish the existence of a product defect. *Id.* (quoting *Elliott*, 903 F.2d at 1507). Ultimately, the "plaintiff bears the burden of proving that the product was in a defective condition when it left the defendant's control." *Jordan v. Gen. Motors Corp.*, 581 So. 2d 835, 837 (Ala. 1991); *see also Bell v. T.R. Miller Mill Co.*, 768 So. 2d 953, 957 (Ala. 2000) (explaining that "the burden of proof rests with the plaintiff to prove that the product left the defendant's control in an unreasonably dangerous condition and not fit for its expected use"). Accordingly, the revolver at issue here must have been defective according to the prevailing consumer standards in 1969, the date of its manufacture, rather than 2014, when Garrison sustained his injury.

For inherently dangerous products like firearms, defectiveness is only established by proving "that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]." *Beech v. Outboard Marine Corp.*, 584 So. 2d 447, 450 (Ala. 1991) (quotation omitted). This entails showing that "(a) [t]he plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that (b) taking into consideration . . . [a variety of factors] the utility of the alternative design outweighed the utility of the design actually used." *Id.* (quotation omitted). However, "simply because a

feasible [alternative design] *could have been* [created] by a proper use of the manufacturer's resources [is not enough to show] that an 'alternative design' existed." *Id.* (quotation omitted); *see also Elliott*, 903 F.2d at 1508 (11th Cir. 1990) (explaining that "courts cannot burden companies with an immediate duty to revolutionize their industry").[4] Moreover, to succeed on either a negligence or an AEMLD claim, the plaintiff must provide evidence "establishing the existence of a safer, practical, alternative design for the allegedly defective product—not a design for a different, albeit similar, product, even if it serves the same purpose." *Hosford v. BRK Brands, Inc.*, 223 So. 3d 199, 208 (Ala. 2016); *see also Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1056 (11th Cir. 1994) ("under Alabama law a plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured its product" to prevail on a negligent design claim); *Brest v. Chrysler Corp.*, 939 F. Supp. 843, 846 (M.D. Ala. 1996) (noting that the Alabama Supreme Court applies the alternative design test to both negligence and AEMLD theories).

In the case at hand, Ruger contests only the defective design element of Garrison's AEMLD and common-law negligence claims, arguing that the revolver met the expectations of an ordinary consumer in 1969, and that, in any event, a

---

[4] But, proof of compliance with "industry-wide practices . . . fails to eliminate conclusively . . . liability for [a] design of [an] allegedly defective product[]." *Elliott*, 903 F.2d at 1508; *see also Dunn v. Wixom Bros.*, 493 So. 2d 1356, 1359 (Ala. 1986) (explaining that "customary practices or standards do not furnish a conclusive test of negligence").

safer design was unavailable prior to 1970. In response, Garrison notes that alternative designs existed, at least as evidenced by other classes of firearms, and that a factual dispute exists with regard to the safety expectations of a reasonable consumer in 1969. The court will first address the question of consumer expectation before turning to the issue of whether a safer alternative design existed.

### 1. Did the Subject Revolver Meet the Reasonable Safety Expectations of an Ordinary Consumer in 1969

The parties' arguments on this point are easily summarized. In essence, Ruger contends that (1) the subject revolver was state-of-the-art for its time, (2) that no other fixed-cylinder, single-action revolver available in 1969 possessed safety features that would have alleviated the risk of accidental discharge indisputably posed by the firearm at issue here, and (3) that the weapon had existed, in substantially the same form, since the 1950s when it first entered the market. Moreover, Ruger contends that responsible gun owners are uniformly aware that it is unsafe to carry a single-action revolver of this type fully loaded with the hammer down. Ruger maintains that these facts establish that the revolver in question, despite the drop-fire hazard it posed, met the safety expectations of an ordinary consumer at the time of its manufacture.

Garrison counters that in 1969 other types of firearms, such as double-action revolvers, utilized "passive" safety features which largely eliminated the risk of accidental discharge without a trigger pull. Garrison also points out that Ruger

12

specifically targeted lay consumers in its marketing campaigns which repeatedly referred to this type of revolver as a "Single-Six" suggesting that it was safe to carry fully-loaded. Finally, Garrison argues that similar drop-fire accidents involving the Ruger "old-model" single action revolver have injured 273 people and killed 34 individuals, doc. 40 at 19,[5] revealing that the firearm was dangerous beyond the expectation of an ordinary consumer.

"[U]nder Alabama law, a jury ordinarily evaluates a plaintiff's claims that a product is defective," *Elliott*, 903 F.2d at 1507, or "the dangerousness of a product." *Tillman*, 871 So. 2d at 32.[6] Although much of evidence in this case is undisputed, the "reasonable" inferences arising from the evidence are not. And, notably, neither party has specifically put forth evidence articulating what safety expectations "an objective 'ordinary consumer,' possessed of the ordinary knowledge common to the community," *Grose*, 586 So. 2d at 198, would have had with respect to the subject revolver in 1969. In this regard, Ruger's primary argument has considerable force. It is true that there is no evidence before the

---

[5] However, the undisputed evidence shows that Ruger sold 858,421 single-action revolvers through 1969 and had only received four reports of drop-fire accidents prior to that point. Docs. 37-2 at 14; 40 at 30; 42 at 8–9. This strongly suggests that reasonable consumers in 1969 knew it was unsafe to carry the revolver fully-loaded and, accordingly, avoided doing so.

[6] Neither side argues that a revolver is a product that is so obviously dangerous it does not involve a defect of the sort "a jury should resolve." *Tillman*, 871 So. 2d at 32 (quoting *Elliott*, 903 F.2d at 1507). The court addresses the question only to point out that although a firearm has certain patently obvious dangers, the danger of discharge without a trigger pull does not fall into this category as it is a risk apart from the particular danger associated with use of revolvers generally. *See id.* at 32–33 (discussing the extremely well-documented dangers associated with the ordinary use of cigarettes); *see also Elliott*, 903 F.2d at 1507 (liability requires more than just showing that "the use of [a] product involves some risk").

court indicating that fixed cylinder single-action revolvers sold at the time possessed a "passive" safety capable of reducing the risk of discharge without a trigger pull prior to 1970. Docs. 37-4 at 38, 41–42; 37-8 at 52. Instead, all the guns in the subject revolver's class, at the time, possessed a similar risk of accidental discharge if a blow directly to the hammer of a fully-loaded weapon was sustained. Doc. 37-8 at 50–51. Given the prevalence of this type of firearm— Ruger sold over 800,000 "old-model" single action revolvers by 1969, doc. 37-2 at 14—and the uniform lack of passive safety-features among firearms falling into this category, it certainly appears likely that an ordinary consumer would have known of the hazard of accidental discharge and acted accordingly.[7]

However, at this stage of the proceeding, the court may not "weigh conflicting evidence," *Mize*, 93 F.3d at 742, and it must draw "all justifiable inferences" in favor of the nonmovant. *See Anderson*, 477 U.S. at 255. In that light, Garrison has put forward enough evidence to create a justifiable inference that the subject revolver would have failed to meet the ordinary safety expectations

---

[7] This inference is strengthened by the fact that, as Ruger has consistently maintained, responsible gun owners are typically aware that a firearm should never be carried with a round in the chamber and the hammer resting on the firing pin. Doc. 37-2 at 3. This rule appears ubiquitous in the safety literature stretching back until at least 1969, and the experts who testified in this case uniformly indicated that the rule reflects standard best practices. Doc. 37-4 24, 27–28; 37-8 at 27. Accordingly, an ordinary consumer would have known that carrying a fully-loaded revolver with a chambered round posed a risk of danger, and the gun would have otherwise met such a consumer's ordinary expectations of safety. As Ruger argues, the subject revolver operates as intended and is perfectly safe when used for its intended purpose. The gun poses a risk, apart from the ordinary danger posed by all guns, only if it is dropped or sustains a blow directly to the hammer while a round is chambered, a risk that ordinary gun users likely expect regardless of the presence of a "passive" safety.

of a consumer in 1969.  First, although Ruger notes that "passive" safety features were not available on single-action revolvers, these types of safeties were routinely used in other classes of firearms, including double-action revolvers, and had existed in some form since the nineteenth century.  Docs. 41-3 at 4–5; 37-8 at 52.  Moreover, there is no dispute that these "passive" safeties would have essentially eliminated the risk of accidental discharge without a trigger pull.  Docs. 37-4 at 11, 26; 41-5 at 46.  While the parties' respective experts have done a great job in explaining the difference between a double-action and a single-action revolver to this court, neither side has indicated that an ordinary consumer, without the benefit of the tutorial provided by these experts, would be able to easily distinguish between the two types of weapons.  In such an instance, a consumer might reasonably assume that these distinct classes of revolver incorporated similar safety features, and, accordingly, that the risk of accidental discharge within each class was correspondingly low.

This inference is further strengthened by Ruger's marketing scheme.  As Garrison points out, Ruger marketed the firearm as a "single-six," commonly referred to the revolver as a six-shooter, and expressly designed it to capture the "Wild West" aesthetic popular during the 1950s and 60s.  Docs. 37-8 at 14, 49–51; 41-23 at 2.  This marketing and design philosophy suggests that Ruger marketed the gun, at least in part, to first time gun owners and other neophytes who might

assume that the revolver was safe to carry fully-loaded.  Therefore, in the absence of expert testimony establishing consumer safety expectations in 1969, the court finds that Garrison has done enough to create an inference that, based on the availability of "passive" safety features in double-action revolvers and other types of firearms, a reasonable consumer in 1969 would have assumed that similar safety features were also incorporated into the subject revolver.

### 2.  Was a Feasible, Safer Alternative Design for the Revolver Available in 1969

To prove defectiveness, however, Garrison must also show that "a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]."  *Beech*, 584 So. 2d at 450 (quotation omitted).  The parties' contentions with respect to this issue are essentially identical to their consumer expectations arguments.  Basically, Garrison avers that the existence of passive safety features on other classes of firearms at the time of manufacture, and the undisputed safety advantage of those designs, suffice to establish the availability of an alternative product design.  Ruger counters that its "old-model" single-action revolver product line is a distinct firearm, targeted at a niche market, and that no comparable safety features existed on that particular class of weapons at the time of manufacture.  After careful consideration of the record, the court concludes that, as a matter of law, no alternative design was available to Ruger at

the time of manufacture, and, consequently, Garrison is unable to sustain his AEMLD and negligence claims.

Under Alabama law, Garrison bears the burden of proving product defectiveness and, necessarily, the existence of a safer, practical, alternative design. *See, e.g.*, *Gen. Motors Corp. v. Jernigan*, 883 So. 2d 646, 662 (Ala. 2003) (explaining that "[i]n an AEMLD case, the plaintiff has the burden of proving a design defect"); *Garrie v. Summit Treestands, LLC*, 50 So. 3d 458, 464–66 (Ala. Civ. App. 2010) (affirming summary judgment on an AEMLD claim when plaintiff failed to show the existence of a specific, alternative design). To meet his burden, Garrison cites two alternative designs: (1) a "transfer-bar safety design[];" and (2) a "rebounding hammer and hammer block safety design." Doc. 40 at 14. Ruger does not dispute that these designs would have prevented Garrison's injuries or that once developed implementing either design would have been feasible. Therefore, the sole question before the court is whether either design was "available" to Ruger for use in its "old-model" single-action revolver in 1969.

Critically, there is no evidence before the court to indicate that any firearm manufacturer had applied either of the proposed safety features to a revolver sharing the essential features of a Ruger "old-model" single-action prior to 1970. With respect to the transfer-bar safety system, Ruger patented such a design, as applied to an "old-model" single-action revolver, in 1973, years after it

manufactured the revolver at issue here. Doc. 37-8 at 51–52.[8] While Garrison's expert noted that these safety features were in use prior to 1970, the expert was subsequently unable to identify, in either his deposition or his report, any single-action revolvers sharing the characteristics of a Ruger "old-model" single-action that incorporated either a "transfer-bar" or a "rebounding hammer" prior to 1970. Doc. 37-4 at 35, 38, 41–42. This testimony by Garrison's expert belies Garrison's contentions that the two designs he proposes were available to Ruger at the time it manufactured the subject revolver.

Additionally, Garrison's contentions regarding the "rebounding hammer and hammer block" design fail for a separate reason. Although the "rebounding hammer" safety design was utilized on single-action revolvers prior to 1970, the undisputed evidence is that this type of safety was only viable when incorporated into a "top-break" or "break action" revolver. Doc. 37-8 at 23. That is, a revolver with a hinged frame enabling the cylinder to separate from the gun frame for loading purposes. *Id.* In the Ruger "old-model" single-action, and other similar revolvers, no such hinge exists, and the cylinder is latched to the hammer. Doc.

_____

[8] While the court does not heavily rely on the issuance of a patent to establish the state of the art at the time of manufacture, the fact that a patent involving the incorporation of a "transfer-bar" into a single-action revolver was issued in 1973 does suggest that the innovation was both novel and nonobvious at the time. *See* 35 U.S.C. §§ 102; 103; *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 12, 14–15 (1966) (describing the three criteria for patentability under the 1952 Patent Act as "novelty and utility . . . and nonobviousness," that is "the difference between the subject matter sought to be patented and the prior art . . . If this difference is such that the subject matter as a whole would have been obvious at the time to a person skilled in the art, then the subject matter cannot be patented").

37-4 at 33–34; 37-8 at 17, 23. Consequently, the unique features of the Ruger "old-model" single-action revolver prevent the use of a "rebounding hammer" design because it would cause the cylinder to unlock as the gun fired potentially exposing the user to the hot gases generated by the firing process. Doc. 37-8 at 52. In other words, the rebounding hammer design is not a feasible alternative for the type of firearm at issue in this case.

The evidence submitted by Garrison in support of the existence of these proposed alternative designs is generally inapposite. First, Garrison's reliance on deposition testimony given by William Ruger in 1982 is misplaced. Although William Ruger testified that certain passive safeties were available for use during the 1950s, he added that this type of safety was not "available, not for a single action," and that "there was no safety for single-action . . . until [he] invented one [in 1973]." Doc. 41-13 at 27 Ruger's current vice-president Kevin B. Reid, supported this testimony. Garrison is certainly correct that Reid indicated that aesthetic calculations factored into the development of a "passive" safety for the Ruger revolver at issue. Doc. 41-5 at 52. However, Reid also explained the mechanical difficulty of incorporating a "rebounding hammer" safety system into the "old-model" revolver, and indicated that the technology enabling the incorporation of a "transfer-bar" safety into the firearm did not exist until the 1970s. *Id.* at 46–47, 52; Doc. 37-8 at 52.

Similarly, the December 1973 letter drafted by an expert witness for Ruger in a separate product liability action, and relied on by Garrison here, does not establish the availability of alternative designs in 1969. Although the letter references attempts by other manufacturers to incorporate various safety features into single-action revolvers to prevent the risk of accidental discharge, it never specifies when those design changes went into effect, and, indeed, the letter affirmatively indicates that the referenced design changes were not implemented before 1970. Doc. 41-19 at 3. The closest the letter comes to establishing the availability of a "passive" safety on a single-action revolver, prior to 1970, is its reference to the incorporation of a "rebounding-hammer" into a revolver designed by Savage Industries in the 1950s. *Id.* at 6. However, this model was "experimental" and there is no indication that it ever went into commercial production. *Id.* Moreover, both of the patents Garrison points to as demonstrating the existence of the "transfer-bar" and "rebounding hammer" safeties prior to 1969 were never applied to revolvers sharing the features of a Ruger "old-model" single-action revolver. Doc. 37-4 at 41–42; 45–46; 37-8 at 52. Instead, the evidence shows that due to the distinct trigger mechanism and loading functionality of the various classes of revolver neither safety could be directly incorporated into a firearm like the Ruger "old-model" single-action revolver at issue here. Doc. 37-4 at 36, 41–42; 37-8 at 52.

Based on this record, Garrison has failed to identify a single firearm, of the same product line as the Ruger "old-model" single-action revolver, possessing either suggested type of "passive" safety before 1970. Perhaps in recognition of the evidence against him on this issue, Garrison contends alternatively that the mere existence of these designs, in conjunction with Ruger's undisputed awareness of the risk of accidental discharge posed by the "old-model" single-action revolver, sufficiently establish that Ruger could have adapted a "passive" safety of some type for use in the firearm by 1969.[9] The court agrees generally that the record does, at the least, support an inference that a sufficiently dedicated engineer could have adapted one of Garrison's proposed alternative designs for use in a Ruger "old-model" single-action revolver prior to 1970. However, the law does not "burden companies with an immediate duty to revolutionize their industry." *Elliott*, 903 F.3d at 1508. Alabama law makes clear that "simply because a feasible [safety feature] *could have been* designed by a proper use of the manufacturer's resources" does not suffice to establish "that an 'alternative design' existed." *Beech*, 584 So. 2d at 450 (quotation omitted) (emphasis original). In other words, that the general technological capacity to create and implement a

---

[9] Evidence establishing that a product conforms to industry standards is not enough, standing alone, to demonstrate that a product is not defective. *See Dunn*, 493 So. 2d at 1359 (noting that "customary practices or standards do not furnish a conclusive test of negligence" as the industry standard itself "may be faulty"). However, this is not a case where, despite the availability of an alternative design, the industry maintained an inferior prior practice. Instead, the record demonstrates that potential alternatives were unavailable in the first instance.

safer, alternative design may have existed is insufficient, as a matter of law, for a plaintiff to establish that design's availability. *See id.* at 449–50 (finding that "there is no cause of action, under either the AEMLD or negligence or wantonness theories" when the only evidence to show an alternative design existed was that "a feasible [alternative, safe design] *could have been* designed by a proper use of the manufacturer's resources") (emphasis original).

Alabama law further forecloses Garrison's argument that the Ruger "old-model" single-action revolver was categorically unsafe for consumer use in light of the existence of other, indisputably safer firearms. "'A manufacturer is not obliged to market only one version of a product, that being the very safest design possible.'" *Hosford*, 223 So. 3d at 207 (quoting *Linegar v. Armour of Am., Inc.*, 909 F.2d 1150, 1154 (8th Cir. 1990)). Indeed, "'[i]t is not rational . . . to impose liability in such a way as to eliminate whole categories of useful products from the market.'" *Id.* at 206 (quoting *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 385 (Tex. 1995)). Put simply, liability under the AEMLD is only appropriate if the plaintiff establishes "the existence of a safer, practical, alternative design for the allegedly defective product—not a design for a different, albeit similar, product, even if [that product] serves the same purpose." *Id.* at 208. After all, "'[a] motorcycle could be made safer by adding two additional wheels and a cab, but

then it is no longer a motorcycle.'" *Id.* at 206 (citing *Caterpillar*, 911 S.W.2d at 385).

Garrison seeks to avoid this conclusion by arguing that Ruger could have incorporated his proposed safety-features into the revolver at issue without changing the nature of the product. This contention is unavailing, however, because Garrison has entirely failed, as explained, to demonstrate that an alternative design for the Ruger "old-model" single-action revolver existed in 1969. Moreover, as Garrison's expert admits, the Ruger "old-model" single-action, or "Colt-type" revolver at issue here is not the same product as the double-action or top-break revolvers that Garrison relies on to demonstrate the feasibility of his proposed safety-features. Doc. 37-4 at 34–36. The Ruger "old-model" single-action was designed to replicate the look and feel of a historical revolver, the Colt Single Action Army, and, to that end, it incorporated the major design features from that firearm. Docs. 41-3 at 3; 37-4 at 34–35; 37-8 at 50. Both guns were single-action with external hammer notches and both included a rotating cylinder with a fixed loading gate. Doc. 37-4 at 33–36. The record indicates that a variety of manufacturers, American and European, designed and built similar single-action, fixed cylinder revolvers during the 1950s and 1960s to capitalize on a distinct market of gun enthusiasts who prized the look and feel of the Colt Single-Action Army revolver. Doc. 37-8 at 23–25, 49–51. Despite the popularity

of this type of revolver, however, even Garrison's expert testified that he could not identify any successful attempts to create a safer firearm by incorporating a "transfer-bar" or a "rebounding-hammer" into the gun prior to 1970. Doc. 37-4 at 35, 38, 41–42.

Although the question of "whether a proposed alternative design in an AEMLD case is sufficiently similar to the allegedly defective product to be considered an actual alternative design . . . is generally a question of fact for the jury . . . there are necessarily some circumstances where a court can" decide the issue as a matter of law. *Hosford*, 223 So. 3d at 205 (quotation omitted). This is one of those cases. For example, in *Hosford*, the plaintiff asserted that her "ionization smoke alarm" was defective and proposed a "dual-sensor smoke alarm incorporating both ionization and photoelectric technology" as a safer alternative. *Id.* at 204. The manufacturer conceded that this type of "dual sensor" alarm was available even though it was more expensive than a design relying purely on ionization. *Id.* However, the Alabama Supreme Court determined that the two proposed alarm designs were different products even though they had an identical purpose, and that, consequently, the plaintiff had not carried her burden of demonstrating the existence of an alternative, safer design. *Id.* at 206–08; *see also Linegar*, 909 F.2d at 1154–55 (finding that varying styles of bullet-proof vests differing in the amount of coverage offered constituted different products);

*Connally v. Sears, Roebuck & Co.*, 86 F. Supp. 2d 1133, 1140 (S.D. Ala. 1999) (explaining that evidence that safety guards were developed for certain types of saws was insufficient to establish the existence of a design incorporating a guard for the type of saw specifically at issue in the case).  Just as in those cases, the Ruger "old-model" single action revolver represents a distinct product with a certain set of features targeted at a particular market of consumers, and Garrison cannot rely on the existence of different products with safer designs to meet his burden of establishing the availability of a "safer, practical, alternative design for the allegedly defective product." *Hosford*, 223 So. 3d at 208.  Therefore, because Garrison has failed to establish the availability of such a design for the Ruger "old-model" revolver at issue here, his AEMLD and negligence claims fail as a matter of law.

### B. Failure to Warn

Although largely abandoned in Garrison's brief, his complaint also appears to assert a failure-to-warn theory as part of his common law negligence claim. *See Turner v. Westhampton Court, L.L.C.*, 903 So. 2d 82, 90 (Ala. 2004) (explaining that a "plaintiff has the option of alleging failure to warn as a matter of negligence [or] under the Alabama Extended Manufacturer's Liability Doctrine").  Under either approach, "[p]roximate causation is an essential element of a prima facie case of . . . failure to adequately warn." *Sears, Roebuck & Co. v. Harris*, 630 So.

2d 1018, 1030 (Ala. 1993). In other words, the plaintiff must show that the defendant "failed to warn adequately of the dangers associated with the use of the [product] and that its failure to do so proximately caused the injury." *Grose*, 586 So. 2d at 198. Accordingly, a claim predicated on this theory "should not be submitted to the jury unless there is substantial evidence that an adequate warning would have been read and heeded and would have prevented the accident." *Id.* Additionally, "[w]here a warning is necessary, the warning need only be one that is reasonable under the circumstances and it need not be the best possible warning." *Gurley v. Am. Honda Motor Co.*, 505 So. 2d 358, 361 (Ala. 1987).[10]

Garrison's failure to warn claim suffers from three flaws. First, a manufacturer is under "no duty to warn a user of every danger which may exist during the use of the product, especially when such danger is open and obvious." *Id.* Indeed, when considering a similar drop-fire accident and a nearly identically worded safety warning, the Alabama Supreme Court found that "the danger of handling a firearm with a live cartridge chambered in line with the hammer and the

---

[10] Moreover, "liability under the AEMLD is 'obviated by an adequate warning.'" *Tillman*, 871 So. 2d at 34 (quoting *Casrell*, 335 So. 2d at 133); *see also Ladner v. Litespeed Mfg. Co.*, No. 2:07-CV-1386-VEH, 2009 WL 10687865, at *14 (N.D. Ala. Feb. 24, 2009) (collecting cases). In other words, "the substance of the affirmative defense of a warning under the AEMLD is not distinct from the duty to warn [at common law]." *Ex parte Chevron Chem. Co.*, 720 So. 2d 922, 926 (Ala. 1998). Here, there is strong evidence that Ruger provided such a warning based on the language in the instruction manual. While Garrison suggests that this warning was not adequate by modern standards, "the warning need only be one that is reasonable" not "the best possible warning." *Gurley*, 505 So. 2d at 361. In any event, Ruger need not avail itself of this complete defense to AEMLD liability because of the court's prior finding that the Ruger "old-style" single-action was not defective.

firing pin without having first engaged the manual safety is self-evident." *Burleson v. RSR Grp. Fla., Inc.*, 981 So. 2d 1109, 1114 (Ala. 2007). Moreover, Garrison, just like the plaintiff in *Burleson*, was an experienced gun user and should have known of the "self-evident" danger of handling a firearm "with a live cartridge chambered in line with the hammer and the firing pin." *Id.* at 1114.

Second, the court need not resolve whether the provided warning was necessary or adequate, because Garrison did not read the instruction manual containing the warning in the first instance. To submit a negligent failure-to-warn claim to a jury, there must be "substantial evidence that the allegedly inadequate warning would have been read and heeded." *Harris*, 630 So. 2d at 1030; *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 971 (Ala. 1985) (explaining that "a plaintiff who does not read an allegedly inadequate warning cannot maintain a negligent-failure-to adequately-warn action unless the nature of the alleged inadequacy is such that it prevents him from reading it"). The undisputed evidence is that Garrison, who acquired the revolver second-hand, neither read nor sought to obtain the instruction manual, which was available both online and directly from Ruger. *See* Docs. 37-2 at 4–5; 40 at 11; 41-1 at 33–34. In other words, this is not an instance where the warnings in the instruction manual were so inadequate that Garrison was unable to read or understand the warning. *E.R. Squibb*, 477 So. 2d at 971. And, Garrison does not otherwise argue that Ruger had a duty to ensure that

second-hand purchasers of the revolver received an instruction manual. Therefore, Garrison cannot demonstrate, as a matter of law, that Ruger's failure to warn was the proximate cause of his accident.

Finally, even if the gun had come with a manual when Garrison acquired it, the evidence suggests that Garrison would still have failed to read any included warning. Indeed, Garrison only read the instruction manual for one of his 18 guns, a Charles Daly 12-gauge semi-automatic shotgun. Docs. 37-7 at 4–5; 41-1 at 33. As for the other 17 firearms, Garrison neither read the provided manuals nor sought out missing manuals if one was not provided at purchase. *Id.* at 31–35; Doc. 37-7 at 4–5.

Garrison's evidence mostly relates to the adequacy of the warning Ruger included in its instruction manual and, at best, represents a "'mere scintilla of evidence in support'" of his failure-to-warn claim, which is insufficient "'to overcome a motion for summary judgment.'" *Melton*, 841 F.3d at 1219 (quoting *Young*, 358 F.3d at 860). In light of this failure to produce evidence suggesting that the danger here was not self-evident or that Garrison would have read, the warnings provided by Ruger in the instruction manual, the allegedly inadequate warning could not have proximately caused the accident. Accordingly, Garrison's

failure-to-warn claim, to the extent it was not waived by his failure to brief it,[11] fails as a matter of law.

## C. Implied Warranty of Merchantability–Count III

Ruger argues that Garrison's breach of the implied warranty of merchantability claim (Count III) merges with his AEMLD claim,[12] presenting an unsettled question of Alabama law. Alabama law professes to recognize a clear distinction between "causes of action arising under tort law and those arising under the U.C.C. as adopted in Alabama." *Shell v. Union Oil Co.*, 489 So. 2d 569, 571 (Ala. 1986). In other words, an action premised on the breach of an implied warranty of merchantability requires a resolution of the question of "[whether the product was] fit for the ordinary purposes for which such goods are used." *Id.* at 572 (quotation omitted) (alterations in original). When the plaintiff's theory is premised on a showing that a product is unreasonably dangerous, the claim is "properly . . . raised [instead] in an action brought under Alabama's Extended Manufacturer's Liability Doctrine." *Id.* at 571. However, the Alabama Supreme Court has subsequently noted that "a claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to

---

[11] *See Marable v. Marion Military Inst.*, 906 F. Supp. 2d 1237, 1255–56 (S.D. Ala. 2012) (explaining that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned") (quotation omitted).

[12] "[T]o sustain a claim for breach of an implied warranty, [Garrison] must show 'the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach.'" *Bagley v. Mazda Motor Corp.*, 864 So. 2d 301, 315 (Ala. 2003) (quoting *Barrington Corp. v. Patrick Lumber Co.*, 447 So. 2d 785, 787 (Ala. Civ. App. 1984)).

redress an injury caused by an unreasonably dangerous product." *Spain v. Brown & Williamson Tobacco Corp.*, 872 So. 2d 101, 112 (Ala. 2003). That determination appeared to turn on "a fact-intensive analysis" to assess whether, as in the case of food products, the defectiveness inquiry overlaps with the question of whether the product is fit for its ordinary use. *Id.* at 108, 109.

As the court understands these two aspects of Alabama law, when the evidence shows that the product is so unreasonably dangerous that it is not fit for its intended use, i.e., it is not a merchantable product, both AEMLD and warranty claims remain viable. *See, e.g.*, *Wilson v. Kiddie Prods. Ltd.*, No. CV-10-BE-3254-S, 2012 WL 3542210, at *10 (N.D Ala. Aug. 14, 2012) (explaining that when determining "whether the breach of warranty claim is subsumed within the AEMLD claim . . . the crucial question is whether evidence exists that the [product] is not fit for its intended purpose"); *Allen v. Delchamps, Inc.*, 624 So. 2d 1065, 1068 (Ala. 1993) (finding, in the context of food products, that an AEMLD claim did not subsume a warranty claim because the question of whether the "goods were . . . unfit for the ordinary purpose for which they [were] used" went hand in hand with whether the goods were unreasonably dangerous for purposes of the AEMLD). On the other hand, if the product is fit for its intended use, even if it contains an inherent danger, the warranty claim, which is concerned only with the commercial viability of the product, is subsumed by the AEMLD claim. *See, e.g.*,

*Bodie v. Purdue Pharma Co.*, 236 F. App'x 511, 523 (11th Cir. 2007) (explaining "courts applying Alabama law have seen fit to subsume U.C.C.-based breach of implied warranty claims into tort and product liability claims, where the product is fit for its intended use and there is no evidence of "non-merchantability" other than a general allegation that the product contains inherent dangers"); *Barnhill v. Teva Pharms. USA, Inc.*, 819 F. Supp. 2d 1254, 1263 (S.D. Ala. 2011) (noting that "[i]n general, Alabama law does not recognize a cause of action for breach of implied warranty of merchantability for inherently dangerous products").

Venturing now into this thicket, it is evident from the record that the Ruger "old-model" single-action revolver was a merchantable product, despite the inherent danger posed by its lack of a "passive" safety. As extensively explained above, Garrison has failed to prove that the product was defective, contained a manufacturing flaw, or posed any unusual danger while being loaded and fired. Instead, he argues only that the gun was unsafe due the drop-fire hazard it posed. To have a separate U.C.C. merchantability claim, however, Garrison must present evidence indicating that the Ruger "old-model" single-action revolver did not operate precisely as intended, aside from the inherent dangers associated with the product.

While Alabama law is less than clear with respect to what constitutes an unmerchantable product, that is a product that is not "fit for the ordinary purposes

for which such goods are used," it is evident that Alabama courts have combined the AEMLD concept of unreasonable danger with the doctrine of "fitness for the ordinary purpose intended" under the U.C.C. *See Ex parte Gen. Motors Corp.*, 769 So. 2d 903, 912–913 (Ala. 1999) (quotations omitted). Again, the heart of the distinction between these two causes of action is that when the breach of implied warranty claim is "to the effect that the [product] was unreasonably dangerous and therefore could not be merchantable," the claim falls under the AEMLD. *Yarbrough v. Sears, Roebuck & Co.*, 628 So. 2d 478, 483 (Ala. 1993).[13] On the other hand, the Alabama Supreme Court has found a distinct violation of the implied warranty of merchantability when the plaintiff could not use the product as intended, regardless of a showing of "danger." *See, e.g.*, *Ex parte Gen. Motors*, 769 So. 2d at 905–06, 913–14 (explaining that evidence that the plaintiff's car stalled repeatedly while in use was sufficient to prove a breach of the implied warranty even without a showing of defectiveness); *Volkswagen of Am., Inc. v. Dillard*, 579 So. 2d 1301, 1302–03, 1307 (Ala. 1991) (explaining that evidence

_____

[13] For example, in *Yarbrough*, the claim involved a heater designed for use with kerosene which exploded when the plaintiff fueled it with gasoline instead. 628 So. 2d at 479–80. Even though the plaintiff presented evidence indicating that a simple design modification would have prevented the explosion, *id.* at 482, the Alabama Supreme Court found that the risk inherent in use of the product did not sound under the U.C.C., because the heater "[w]hen . . . used properly . . . [met] an ordinary consumer's expectation by heating the house." *Id.* at 481. The court rejected the plaintiff's argument that the inherent danger posed by the use of the wrong fuel rendered the product unmerchantable. *Id.* at 481, 483.

that a car continuously stalled and failed to properly accelerate was evidence of a breach of the implied warranty of merchantability).

The numerous federal courts to address the issue have also recognized this common sense distinction. *See, e.g.*, *Collins v. Novartis Pharms. Corp.*, No. 2:08-cv-438-MHT-PWG, 2015 WL 178157, at *7 (M.D. Ala. Jan. 14, 2015 ) *adopted in relevant part by Collins v. Novartis Pharms., Corp.*, No. 2:08-cv-438-MHT, 2015 WL 2183700 (M.D. Ala. May 11, 2015) (recognizing that "in almost every case, a claim of an alleged breach of implied warranty of merchantability under the UCC is subsumed by [the] AEMLD except for a theoretical possibility which has only been applied on summary judgment to the consumption of food products  and never to . . . products with another consumer use beyond consumption"); *Houston v. Bayer Healthcare Pharms.*, *Inc.,* 16 F. Supp. 3d 1341, 1346–47 (N.D. Ala. 2014) (explaining that under Alabama law "the commercial code creates only commercial warranties, not safety warranties" and that consequently, so long as the product achieves its function the U.C.C. is not breached regardless of other harm caused by the product); *Barnhill*, 819 F. Supp. 2d at 1263 (noting that evidence dealing with the "inherent dangers" associated with product use is insufficient to support a breach of implied warranty claim independently from an AEMLD claim).  In other words, when "there is no evidence of 'non-merchantability,' other than a general allegation that the product contains inherent dangers," the U.C.C.

claim fails. *Bodie*, 236 F. App'x at 523–24 (concluding that plaintiff's claim that OxyContin was unreasonably dangerous and was therefore not of merchantable quality was not cognizable under Alabama law as a distinct claim for breach of the implied warranty of merchantability).

To get around this unfavorable precedent, Garrison cites *Wilson v. Kiddie Products, Ltd.* for the proposition that his AEMLD and breach of the implied warranty claims go hand in hand. However, *Wilson* is inapposite because it presented a jury question on whether the product at issue was fit for its ordinary use. *See Wilson*, 2012 WL 3542210, at *10. Under the facts in *Wilson*, the court found that there was a dispute regarding the purpose of the product at issue, and, accordingly, a jury question existed regarding whether the product was fit for that purpose, whatever it might be. *Id.* In this instance, however, Garrison has failed to show that the Ruger "old-model" single-action revolver was not fit for ordinary use as a firearm, or that it was otherwise incapable of carrying out its expected, routine functions. Instead, his theory, supported by his expert's *ipse dixit* assertion of commercial unsuitability, doc. 41-3 at 9,[14] is that the weapon has an inherent defect rendering it unreasonably dangerous. Doc. 40 at 32. Even if that were the case,

---

[14] Garrison's expert states that: "a modern designed and manufactured revolver that will fire without pulling the trigger is not fit for its ordinary intended purpose." Doc. 41-3 at 9. This conclusion is not supported by any factual evidence with respect to the commercial purpose of the firearm, and whether it was fit for that purpose. As such, the court does not grant this legal conclusion any weight because "[a] witness . . . may not testify to the legal implications of conduct." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).

Garrison cannot prevail on a breach of implied warranty claim without some showing that the subject firearm was not fit for its intended purpose, and there is no basis to draw such a conclusion on the record before the court. Accordingly, the court finds that Garrison's claim for the breach of the implied warranty of merchantability is subsumed by his AEMLD claim.[15]

### D. Wantonness and Punitive Damages

The parties agree that punitive damages are only available in a civil tort action in Alabama if "it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to the plaintiff." Ala. Code. § 6-11-20(a). As relevant here, Garrison's requests for punitive damages turn on his wantonness claim, which, although not asserted as a separate count, appears in several places in the complaint. Wantonness is "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20(b)(3). In other words, wantonness is "the conscious doing of some act or the omission of

---

[15] Moreover, there is Alabama law, in the context of allergic reactions to medical drugs, supporting the position that "a product must adversely affect at least some significant number of persons before a question of 'merchantability' arises." *Griggs v. Combe, Inc.*, 456 So. 2d 790, 793 (Ala. 1984); *see also Pearl v. Mad Engine, Inc.*, No. 7:12-cv-2850-TMP, 2015 WL 5179517, at *6–7 (N.D. Ala. Sept. 4, 2015) (applying *Griggs* outside of the medical context to find that there must be a showing of unsuitability "in some number of instances" before the implied warranty of merchantability is breached). Here, the evidence shows that a total of four similar accidents were reported to Ruger between 1953 and 1969. Docs. 40 at 30; 42 at 8–9. By then, Ruger had sold over 800,000 of its "old-style" single-action revolver. Doc. 37-2 at 14. This evidence falls short of establishing the adverse impact on a "significant" number of people necessary to raise a question of merchantability.

some duty while knowing of the existing conditions *and* being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (emphasis original); *see also Ex parte Capstone Bldg. Corp.*, 96 So. 3d 77, 85 (Ala. 2012) (explaining that wantonness requires an "act done or omitted with knowledge of the probable consequence and with reckless disregard of such consequence"). Importantly, wantonness is not simply a more extreme form of negligence; it is a "qualitatively different tort concept[]." *Ferguson v. Baptist Health Sys., Inc.*, 910 So. 2d 85, 92 (Ala. 2005) (quotation omitted).

Garrison's wantonness argument is essentially that Ruger knew about the drop-fire hazard based on reports of at least four similar incidents prior to 1969, and its own internal testing conducted in 1971. Docs. 40 at 17–18, 30; 42 at 8–9. Garrison also cites the existence of "passive" safeties capable of preventing drop-fire incidents in other types of weapons, arguing that, despite its awareness that its "old-model" single-action revolver lacked such protections, Ruger continued production of the firearm anyway. This argument fails for two independent reasons.

First, Garrison has failed to show, as he must, that his injuries would "likely or probably" result from Ruger's actions or omissions. *Essary*, 992 So. 2d at 9. Based on the four reports of drop-fire accidents received by Ruger in 1969, less

than 0.0005 percent of "old-model" single-action revolvers produced at the time were reportedly involved in incidents similar to the one experienced by Garrison. Docs. 37-2 at 14; 40 at 30; 42 at 10. Even considering all 307 reports Ruger has received to date, only 0.02 percent of the total number of "old-model" single-action revolvers sold by the company have been involved in incidents similar to the one at issue here. Docs. 40 at 18–19; 37-2 at 4. As the Eleventh Circuit applying Alabama law has held, when the "*actual* incidence" of a particular risk is "probably slightly less than one percent," it does not qualify as a likely event for purposes of a finding of wantonness. *Toole v. McClintock*, 999 F.2d 1430, 1435 (11th Cir. 1993) (*Toole I*) (emphasis in original). Based on this record, it is evident that the injury suffered by Garrison was not sufficiently likely or probable for Ruger's failure to alter the design of its "old-model" single-action revolver to qualify as wanton.

Garrison resists this conclusion by arguing that the Alabama Supreme Court has previously found that evidence of two similar drop-fire accidents was sufficient to submit a wanton design claim to the jury. *Savage Indus., Inc. v. Duke*, 598 So. 2d 856, 859 (Ala. 1992). However, that decision is readily distinguishable. The plaintiff in *Duke* presented evidence showing that the manufacturer conducted internal testing prior to the plaintiff's accident, and "had subsequently added a second safety to adult model shotguns in 1970 but had not added a second safety in

the youth model shotguns until 1979." *Id.* at 856–57. The plaintiff's accident occurred using a youth shotgun without the additional safety and purchased years after the manufacturer had begun adding a second safety to its adult model shotguns. *Id.* The court does not read *Duke* as contradicting the threshold probability requirement established by the Eleventh Circuit in *Toole I*. Instead, *Duke* turned on the evidence showing that the manufacturer took particular actions to alleviate a recognized danger and neglected to uniformly apply those changes to all the firearms posing a danger. Here, there is no evidence that Ruger made any changes to its "old-model" single-action revolver until 1973 when it first developed a "passive" safety for use on the product and uniformly employed the new design in its revolvers. On this record, the court declines to find that Garrison has put forward sufficient evidence to meet his minimal burden of showing that his injury was more than one percent likely.

Second, even if Ruger knew that manufacturing the Ruger "old-style" single-action was likely to result in the injuries suffered by Garrison, his wantonness claim for punitive damages still fails. The Eleventh Circuit, when applying Alabama law, has "repeatedly held that the issue of punitive damages should not go to the jury when a manufacturer takes steps to warn the plaintiff of the potential danger that injured him; such acts bar a finding of wantonness." *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994). In other

words, even when the manufacturer "could have done or said more," the presence of a warning outlining the risk of harm shows "'regard for [consumers] of [the product] and cannot be viewed as wanton' . . . as defined by Alabama law." *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1317 (11th Cir. 2000) ( *Toole II*) (quoting *Toole I*, 999 F.2d at 1436); *see also Scharff v. Wyeth*, No. 2:10-cv-220-WKW, 2012 WL 3149248, at *9 (M.D. Ala. Aug. 1, 2012) (explaining that "[u]nder *Toole* [*I*] all that is required is a warning that does not evidence indifference toward safety" regardless of whether the warning "could have been broader [or] stronger"). Garrison has not provided the court with any contrary case law on this point, and has otherwise offered no argument casting doubt on the continuing validity of this line of precedent. Accordingly, the court is "bound by [its] governing appellate court's construction of state law unless later state court decisions indicate that the Court of Appeals' earlier prediction of state law was in error." *Estate of Miller ex. rel. Miller v. Thrifty Rent-A-Car Sys., Inc.*, 609 F. Supp. 2d 1235, 1249–50 (M.D. Fla. 2009) (quotation omitted).

The undisputed evidence is that Ruger provided an instruction manual with each of the "old-model" single-action revolvers it sold. Doc. 37-2 at 3. That manual, in a "special note," explained to users that "certain precautions should be observed in the interests of safety," and warned users that if the gun is carried with the hammer resting on the firing pin and a loaded cartridge in the chamber aligned

with the barrel, "a light accidental blow on the hammer can readily cause the gun to discharge." *Id.* at 10. The manual also suggests that carrying the revolver with only five chambers loaded and aligning the barrel with an empty chamber was a safe method for carrying the gun preferred by "[m]any users." *Id.* Also, even though Ruger no longer produces the "old-model" single-action revolver, similar safety warnings appear on the company's website, and the company continues to make an instruction manual for the weapon available upon request. *Id.* at 4–5. While the parties debate the efficacy of the manual's safety note, and it is apparent that Ruger could have provided a more strident warning, the fact that a message pointing out the exact risk of harm suffered by Garrison is reflected in the manual "bar[s] a finding of wantonness." *Richards*, 21 F.3d at 1059.

## IV.   CONCLUSION

For the foregoing reasons, Ruger's motion for summary judgment, doc. 37, is due to be granted. And, for the reasons already discussed, Connie Sue Garrison's derivative claim for loss of consortium is also due to be dismissed. A Final Judgment will be entered separately.

**DONE** the 12th day of June, 2018.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE
